(November 10, 2011)

■ KENZIE GODFREY, Respondent-Appellant, v G.E. CAPITAL AUTO LEASE, INC., Respondent, and BALHAR SINGH et al., Appellants-Respondents, et al., Defendants. [933 NYS2d 208]—

On August 30, 2001, plaintiff was a passenger in the rear seat of a taxi operated by defendant Adjei. It collided at an intersection, controlled by traffic lights in each direction, with an automobile operated by defendant Altieri. Altieri was driving the vehicle with the consent of defendant Sgarlato, who in 1995 leased the car from defendant G.E. Capital Auto Lease, Inc. (GE). She purchased it outright from GE in 1999. Although she entered into a retail installment sales contract with GE at that time, Sgarlato did not complete the paperwork necessary to transfer title to herself until 2002, after the accident.

Altieri testified at trial that she had the right-of-way and was driving within the speed limit. Adjei failed to comply with a subpoena requiring him to testify. However, according to his deposition testimony, which was read to the jury, he proceeded within the speed limit through a green light. Plaintiff was not wearing a seat belt and she hit her head on the taxi's partition. She did not recall whether the taxi was equipped with a seat

belt. An accident reconstruction specialist retained by Altieri and Sgarlato testified that the particular model of the taxi driven by Adjei was equipped with rear shoulder and lap belt harnesses. Had the seat belts been worn, the expert stated, they would have restrained plaintiff from contacting the partition. He conceded that plaintiff still could have hit her head on the seat in front, but the impact would not have been as forceful.

Plaintiff was a college student concentrating in physics at the time of the accident. She testified that in the week following the accident, she could not focus or keep her normal pace, and she felt dizzy and had terrible pain in her head. She missed a number of her classes, and sometimes slept for 20 hours at a time. About a week after the accident, she sought treatment at the emergency room at Bellevue Hospital, where she was admitted for two days. Plaintiff testified that when she resumed her classes that fall, she had difficulty keeping her schedule straight, doing easy equations, following instructions, and retaining things she had read. She stated that she registered with the office for students with disabilities, which allowed her more time for assignments and exams and gave professors leeway in grading. She completed the semester and passed all of her classes, but ultimately failed to complete her bachelor's degree.

Plaintiff also claimed at trial that after the accident she began feeling depressed and lethargic, and began to experience fear of leaving her house, sensitivity to lights, and difficulty with noise and crowds, which made her feel very disoriented. She sought treatment from a psychotherapist, and continues to be treated by a neuropsychologist, who sets goals and helps keep her organized. A few months after the accident, plaintiff averred, she began experiencing seizures, which involved blackouts, severe muscle spasms, cramping in her extremities, and incontinence. She maintained that she suffers severe headaches almost daily and takes several medications. She participates in a program which provides her with some home care assistance and a living skills coordinator to help with activities of daily living. She testified that she has tried to work, taking administrative jobs and hostess positions at restaurants, but she is frequently confused and unable to sustain the necessary pace.

Plaintiff's medical evidence established that she suffered a traumatic brain injury, a diagnosis that was not rebutted by any medical evidence submitted by defendants. Her treating psychiatrist testified that plaintiff's symptoms were causally related to the accident, that her prognosis was "poor," and that she will need psychiatric care for the remainder of her life. Her treating neurologist similarly opined that plaintiff's condition was per-

manent, and was solely related to the trauma suffered because of the accident. He predicted that plaintiff would suffer from serious lifelong impairments to her memory, verbal skills, and reasoning ability, as well as depression, and would need medication that impairs her liver and causes other side effects. According to the neurologist, plaintiff will require home assistance for the rest of her life, as well as regular neurological visits, and her condition and the medications will make her unable to work. A neuropsychologist who treated plaintiff rendered a similar opinion.

In support of her claim for economic damages, plaintiff proffered the testimony of Brian Schuster, a neuropsychologist. Dr. Schuster testified that plaintiff had scored in the "very superior" range on a battery of nonverbal assessment tests he administered, and that she is a "very bright person." However, on verbal assessment tests, he testified, plaintiff's scores were "average." Although he noted that she exhibits knowledge of college level math, she solved problems slowly. Dr. Schuster opined that plaintiff had sustained an injury in the left hemisphere of her brain, which is associated with language, and that, although she demonstrated no problem with her motor skills, her language skills are "average." Plaintiff could not be expected to hold a job because an employer could not rely on her to show up or be able to function if she did.

Dr. Schuster opined that had plaintiff not been injured, she would have been able to perform any number of highly-skilled professional jobs, even though she had no clear vocation before the accident. These jobs were identified by entering plaintiff's profile in a database maintained by the Department of Labor. They included certain positions which Dr. Schuster testified were consistent with plaintiff's interests in physics and mathematics, such as civil engineer and pharmacist. According to Dr. Schuster, the average salary for these jobs was $72,981.47 per year, as reflected in 2005 wages. Finally, Dr. Schuster testified regarding a life-care plan he had prepared regarding plaintiff, which identified the various elements of care, tests, medication and equipment plaintiff would need over the course of her life, as well as the current cost of each item.

Plaintiff also called Dr. Alan Leiken, an expert economist. Dr. Leiken opined that, assuming plaintiff would have left the work force at age 62, her total income loss would be $5,373,411, which includes an additional 25% in employer-provided benefits. Dr. Leiken's testimony also included his opinion about the cost of lifetime care of plaintiff based on her statistical life expectancy of 80.6 years. He stated that the total cost would be $5,982,751.

The parties stipulated at trial that plaintiff had already incurred medical expenses in the amount of $133,652.

Defendants called two experts who disputed plaintiff's request for lost earnings. Dr. Armando Rodriguez, a professor of economics and finance, testified that Dr. Leiken's and Dr. Schuster's reports regarding plaintiff's claimed loss of earnings were methodologically flawed and insupportable. Specifically, he opined that no legitimate basis existed for Dr. Schuster's projection, utilized by Dr. Leiken in his calculations, that plaintiff would be able to earn $72,900 upon graduation, since she had no proven track record of earning significant income. Dr. Rodriguez also maintained that additional flawed assumptions in Dr. Leiken's report further undermined his calculations of future lost earnings and medical expenses. For instance, he testified, Dr. Leiken had failed to account for job maintenance expenses, erroneously assumed that plaintiff would have worked continuously until the age of 62 without any period of unemployment, applied too high a percentage to calculate annual wage increases, and incorrectly double-counted benefit amounts which are already factored into wages. He stated that Dr. Leiken's figures for annual increases in medical care were also overinflated by .5%, which amounts to a significant difference when calculated over 30 years.

Rosalind Zuger, an expert vocational consultant, testified that she looked at medical records, interviewed plaintiff, and administered four "map reading" tests, which are used to assess traumatic brain injury victims' ability to process information. In Ms. Zuger's opinion, plaintiff had 100% accuracy, performed with no hesitation, and organized the material and information well. She pointed out that plaintiff had apparently not tried any vocational program offered by rehabilitation agencies to evaluate what she was able to do, even though the services of the New York State Rehabilitation Agency is free of charge. Zuger testified that in her view, plaintiff is capable of working and that she has placed individuals in jobs who have disabilities similar to or worse than plaintiff's.

At the close of the evidence, plaintiff moved for a directed verdict against Adjei based on his failure to appear and testify at trial. The court denied the motion. However, it gave a missing witness charge, instructing the jury that, if it did not find Adjei's explanation for his absence reasonable, it could conclude that his testimony would not have supported his case, and draw the strongest inference against him.

The court also denied plaintiff's request for a detailed charge on the issue of ownership under the Vehicle and Traffic Law,

but charged that the jury "must consider . . . whether GE is also an owner of the vehicle owned by . . . Sgarlato," that GE "cannot be held responsible for this accident unless [the jury] determine[d] that GE was the owner of the Jeep at the time the accident occurred," and that plaintiff bore the burden of proof by a preponderance of the evidence. GE objected to any charge on ownership.

The jury returned a verdict that Altieri was completely responsible for the accident. It found that GE was not an owner of the vehicle operated by Altieri at the time of the accident. The jury awarded plaintiff damages for past pain and suffering in the amount of $260,000, and in the amount of $3,332,000 for future pain and suffering. It awarded her $286,171 for past lost earnings and $928,219 for future lost earnings. As for future medical costs, the jury awarded plaintiff $5,982,751. It did not award any money for past medical expenses. Finally, although the jury found that "a reasonably prudent passenger in plaintiff's position [would] have used an available seatbelt," it found that none of her injuries were caused by her failure to use a seat belt.

All parties moved to set aside the verdict. Plaintiff moved to set aside the verdict that Adjei was not negligent, and that GE was not an owner of the vehicle. She also sought an increase in the damages awarded by the jury for her past and future lost earnings. Altieri and Sgarlato cross-moved to set aside the verdict as to Altieri's and Adjei's relative degrees of culpability; for a new trial on the issues of liability and damages; and for a new trial on the issue of plaintiff's failure to use an available seat belt. GE conditionally cross-moved, in the event the court determined that GE was an owner of the vehicle, to set aside the damages verdict and for a new trial on the issue of damages; and to set aside the jury's finding that plaintiff's injuries were not caused by her failure to use an available seat belt.

The court granted plaintiff's motion for a directed verdict against Adjei and directed that judgment be entered against him finding him negligent in the operation of his taxi and apportioning 50% liability against him. This was based "upon the unrebutted testimony" of Altieri that Adjei ignored a red light and the fact that he did not appear at trial. The court denied plaintiff's motion to set aside the verdict with respect to GE, holding that GE was not, as a matter of law, an owner of the Jeep. Finally, without explanation, the court granted a new trial on damages and the issue of "to what extent her failure to use an available seatbelt contributed to her damages."

A jury's verdict may be reversed on the grounds of legal in-

sufficiency only where "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). Here, applying that standard, the jury's conclusion that Altieri was fully responsible for the accident should not be disturbed. Despite the conflicting testimony, the jury could fairly have concluded that Adjei failed to see Altieri, not because he was negligent, but because Altieri's vehicle either was blocked from view by other cars or drove through a red signal (*see D'Onofrio-Ruden v Town of Hempstead*, 29 AD3d 512, 513-514 [2006]). The record presents no grounds for disturbing the jury's determination that Adjei's version of events was more credible than Altieri's (*see Lunn v County of Nassau*, 115 AD2d 457, 458-459 [1985]).

Further, to the extent it apportioned 50% of the responsibility to Adjei as a penalty for his failure to appear at trial, the court erred. The missing witness charge was a sufficient sanction for Adjei's absence and there is no basis for disturbing the jury's conclusion that, notwithstanding the adverse inference, Altieri was not credible in her testimony as to how the accident occurred.

Concerning GE's liability, title to a motor vehicle is transferred when the parties intend such transfer to occur (*see Potter v Keefe*, 261 AD2d 864 [1999]). Thus, title to a vehicle may pass to a purchaser when she takes delivery of it, notwithstanding that formal registration of the vehicle in the purchaser's name occurs later (*see Pearson v Redline Motor Sports*, 271 AD2d 222 [2000]). Here, even though the registration and license plates of the vehicle driven by Altieri were still in GE's name at the time of the accident, the evidence established that GE delivered an executed certificate of title and possession to Sgarlato on September 10, 1999. Although Sgarlato did not retitle the vehicle in her name until after the accident, the title document evidences that the sale occurred, and GE became a mere lienholder, as of September 10, 1999 (*see* Vehicle and Traffic Law §§ 128, 2113 [b], [c]; *Potter*, 261 AD2d at 865-866). It is academic that the court refused to charge the jury on the meaning of "ownership" under the Vehicle and Traffic Law. The facts firmly establish that, under any definition of the term, GE was not still an owner at the time of the accident. Indeed, the court could have decided the question as a matter of law.

We turn now to the damages awards. Proof of lost earnings must be established with reasonable certainty (*Estate of Ferguson v City of New York*, 73 AD3d 649, 650 [2010]). In

considering whether a jury's damages award is inconsistent with the evidence, we are, again, guided by the notion that the jury's conclusions should be overturned only where they are essentially irrational (*see Freeman v Kirkland*, 184 AD2d 331, 332 [1992], citing *Cohen v Hallmark Cards*, 45 NY2d 493 [1978]). Plaintiff argues that she established all of her lost earnings within that standard through the testimony of Dr. Schuster and Dr. Leiken, and asks us to increase the jury award accordingly. Defendants, on the other hand, urge us to adopt the testimony of their experts, who opined that plaintiff was not entitled to any lost earnings award. They place much emphasis on the fact that plaintiff continued to attend classes after the accident, and fault her for not submitting any evidence to support her testimony that she received special accommodations from the school's office for students with disabilities.

The jury's damages award apparently reflects the fact that the jury accepted portions of the testimony of both sets of experts. It was not irrational for the jury to conclude that plaintiff's ability to realize her full work potential would be impaired because of the accident. After all, defendants presented no medical evidence to rebut plaintiff's medical experts' opinions that she suffered a traumatic brain injury that made it very difficult for her to carry out routine activities. Moreover, the jury was entitled to believe plaintiff's testimony that she was able to continue some courses after the accident only with accommodations, notwithstanding the lack of additional evidence of such accommodations. On the other hand, it was not necessarily inconsistent for the jury to reject plaintiff's experts' opinions that she was utterly incapable of working in *any* capacity, or to question their calculations of what her earning capacity would have been if the accident did not occur. Indeed, the jury's lost earnings award reflects that the jury simply did not view the claim for lost earnings as an all-or-nothing proposition, but attempted to strike a balance between the parties' positions. Accordingly, the court erred in rejecting the jury's findings on lost earnings.

As for medical expenses, defendants argue that the award to plaintiff of the entire cost of the life-care plan espoused by Dr. Leiken is inconsistent with the jury's slashing of the lost earnings sought by plaintiff. We disagree. The jury did find that plaintiff would forfeit nearly $1,000,000 in earnings over the course of her life as a result of the accident. This confirms that the jury believed that plaintiff sustained a significant impairment to her health, and it would not have been irrational for it to conclude that she required all of the medical attention included in the plan. Further, the jury could have rationally

concluded that, to the extent plaintiff would be able to earn some sort of living in the future, she could only do so with significant medical care and other treatment. While defendants claim that Dr. Leiken exaggerated the growth rate for medical care (5% per year), Dr. Rodriguez' testimony concerning the proper rate, which was limited to the statement that "I think it was 4.5," was equivocal and unsupported. Accordingly, we cannot conclude that the jury improperly adopted Dr. Leiken's figure. Nor are there any other grounds to find that the IAS court properly vacated the award for future medical expenses.

As to plaintiff's claim for past medical expenses, the jury's failure to award plaintiff any recovery for such damages is inconsistent with its liability finding. Moreover, the parties' stipulation that the fair and reasonable value of past medical expenses was $133,652 should be enforced (*see Sanfilippo v City of New York*, 272 AD2d 201 [2000], *lv dismissed* 95 NY2d 887 [2000]).

On the issue of mitigation, we reject plaintiff's argument that defendants failed to establish the presence of seat belts. Defendants' accident reconstruction expert gave sufficient testimony concerning the likelihood that the taxi was equipped with seat belts to allow the jury to conclude that it was. As to the effect of plaintiff's failure to utilize a seat belt, it is well settled that a plaintiff's failure to do so goes to mitigation of damages only, not to comparative liability (*see Spier v Barker*, 35 NY2d 444, 450 [1974]; *Garcia v Tri-County Ambulette Serv.*, 282 AD2d 206, 207 [2001]; *see* PJI 2:87.1). Defendants argue that the jury's finding that plaintiff should have used a seat belt was inconsistent with its conclusion that none of her injuries were caused by her failure to use a seat belt.

We agree. The accident reconstruction expert testified that plaintiff's head injuries would not have been so severe if she had been wearing a seat belt. Plaintiff's own treating neurologist testified to the same effect. Plaintiff offers no plausible explanation for how the jury could have found her negligent but failed to account for her conduct in making its damages award. Accordingly, the court correctly ordered a new trial to determine the amount by which plaintiff's total damages should be reduced because of her failure to use a seat belt.

Finally, the jury's award for future pain and suffering deviates from what would be reasonable compensation to the extent indicated (CPLR 5501 [c]). Concur—Gonzalez, P.J., Mazzarelli, Richter, Manzanet-Daniels and Román, JJ.