| |
| --- |
| **Brown v 271 Madison Co.** |
| 2025 NY Slip Op 31715(U) |
| May 12, 2025 |
| Supreme Court, New York County |
| Docket Number: Index No. 152267/2015 |
| Judge: James d'Auguste |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:    Hon. James E. d'Auguste                         PART 55

                    *Justice*

------------------------------------------------------------------X

MEGHAN BROWN,

                                Plaintiff,

                        - v -

271 MADISON CO., FOX GLASS OF BROOKLYN, INC.,
BRONX WESTCHESTER TEMPERING, INC.,

                                Defendants.

------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 152267/2015 |
| MOTION DATE | 05/28/2024 |
| MOTION SEQ. NO. | 007 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 007) 261, 262, 263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 319

were read on this motion to/for _____ SET ASIDE VERDICT _____ .

Defendant's motion to set aside the verdict rendered March 28, 2024, is denied for the reasons set forth below.

This action arose from an incident that occurred at 271 Madison Avenue in Manhattan on February 2, 2015. Plaintiff suffered head trauma and a traumatic brain injury ("TBI") when a large glass entrance door to the subject building shattered with large pieces of glass striking her on the head. The cause of the accident was a pre-existing crack in the glass door measuring at least 9.4 millimeters, which broke when an individual placed his hand at that location to push the door open. The falling glass shattered into tiny pieces, but remained conglomerated in chunks of various sizes. The broken glass hit plaintiff in the head propelling her out of the building itself onto the sidewalk. Plaintiff re-entered the building with the help of two individuals. Thereafter, she collapsed to the floor.

[* 1]

The incident, its aftermath, and the period reasonably relevant to notice to defendant of a defective condition, was recorded on a building video. However, an investigator with defendant's primary insurer inexplicably permitted most of this video footage to be erased.[1] The limited video footage that survived was the accident itself, and even then, it was a low-grade cell phone video of a monitor (video of a video), rather than the original video recording. The permitted erasure of the video evidence was highly prejudicial to plaintiff.[2] Notably, defendant's superintendent, Nelson Santos, admitted that he never instructed his staff to look for cracks in the glass door. Nonetheless, plaintiff's expert was still able to opine that the minimum 9.4-millimeter-long crack was present and observable for days, if not weeks, preceding the subject accident.[3] Additionally, the period after plaintiff collapsed, including her treatment by paramedics and removal to the hospital by ambulance, was also permitted to be overwritten.

Despite significant pain due to the incident, plaintiff's prognosis was relatively hopeful. Plaintiff was discharged from the hospital without even a CT scan being performed. NYSCEF Doc. No. 267. Three days post-accident, however, plaintiff visited Dr. Jaydeep Bhatt, a

---

[1] This individual's affiliation with an insurance company was not disclosed to the jury. Additionally, the jury was not informed that defendant purchased specialty glass insurance to cover the two main entrance doors after a previous breakage. Further, the jury was not notified that the glass company pre-programmed into the superintendent's cell phone was an insurance company vendor.

[2] Based upon defendant's willful destruction of evidence, the Court determined that plaintiff was entitled to a negative inference charge on the issue of liability, but not on the issue of damages. However, plaintiff declined this limited adverse inference instruction and instead exercised her ability to fairly comment on its erasure during summation.

[3] In contrast to Ashutosh Goel, Ph.D., a credentialed professor of materials science and engineering, defendant's glass expert, Eugene Negrin, provided opinions almost exclusively based upon his work experience. As discussed below, the jury was entitled to credit plaintiff's experts and reject those called by defendant. *McMillian v. Burden*, 136 A.D.3d 1342, 1344 (4th Dep't 2016). In this regard, the jury was, therefore, also free to reject the testimony of Connor McCourt, a forensic videographer, who asserted that he could not discern any visible defect in the glass door based upon his examination of the second-generation cell phone video. Notably, this video was of an insufficient quality to record the "271" numerical decals, despite their existence on both glass doors at the time of the accident.

[* 2]

neurologist at NYU Langone Health System, complaining of headaches, photophobia, feeling faint, and difficulty concentrating. The following day, plaintiff also reported to Dr. Andrei Osipov, a psychiatrist, that she was suffering from a loss of a sense of smell and taste, vertigo, insomnia, forgetfulness, light sensitivity, and difficulty processing written material and understanding verbal conversations. NYSCEF Doc. No. 268. Plaintiff was also apparently suffering difficulty with her time orientation, as she was reporting the symptoms as being weeks old when it was only four days post-accident. *Id.*

In March 2015, plaintiff was continuing to complain about symptoms ranging from the loss of taste and smell to difficulty focusing. As such, Dr. Bhatt ordered an MRI to evaluate plaintiff for head trauma and post-concussion syndrome with anosmia, which came back negative. Plaintiff commenced treatment by Dr. Leigh Lachman, an ENT with Mount Sinai, who noted plaintiff was suffering from head trauma, anosmia, and noise sensitivity. Plaintiff was also referred to Dr. Felica Fraser, a neuropsychologist at NYU Langone Health System, for neurological testing, cognitive remediation therapy, and counseling sessions due to her head injury.

In May 2015, Dr. Jamie Levine, a neurologist at NYU Langone Health Systems, referred plaintiff for vocational therapy. During continuing visits, Dr. Lachman confirmed her impression that plaintiff was suffering from anosmia post trauma. Dr. Osipov documented that plaintiff was commencing a comprehensive treatment program. He noted plaintiff's TBI diagnosis, and that she was no longer actively working at her employer due to a disability diagnosis. These negative observations regarding plaintiff's employment at JP Morgan Chase by Dr. Osipov were in sharp contrast with the positive observations he documented on February 6, 2015. Plaintiff noted her anxiety that her condition— "anosmia, photophobia, audiophobia,

memory problems, dizzy spells, difficulty word finding, sentence completion, dyslexia, etc."— were not improving; however, Dr. Osipov reassured plaintiff that things could improve with time. He also noted that plaintiff's sister had been staying with her, but this led to conflicts because she was easily becoming annoyed and distracted. Additionally, plaintiff was so forgetful that she repeatedly neglected food cooking on a burning stove.

In June 2015, plaintiff was seen by Dr. Richard Doty, the Director of the University of Pennsylvania's Smell and Taste Center. NYSCEF Doc. No. 304. His testing confirmed that plaintiff had suffered significant deficits in smell and taste. *Id.* As stated in his report:

> In summary, our tests find that Ms. Brown has severe but not total loss of smell. Function unaccompanied by meaningful loss of taste-bud mediated taste sensations, per se. Her complaint of taste loss most likely reflects decreased appreciation of food flavor, since most "tastes" are dependent upon the sense of smell. Thus, while the flavors of the majority of foods (e.g., chocolate, raspberry, vanilla, steak sauce, etc) are often attributed to "taste", in fact they largely reflect retronasal stimulation of the olfactory system during chewing and swallowing.

*Id.* In his report, Dr. Doty attributed plaintiff's injury to her head trauma as it is "a common cause of smell dysfunction and usually reflects coup contra coup shearing of the olfactory filaments at the level of the cribriform plate of the ethmoid bone." *Id.* Dr. Doty further noted these deficits place plaintiff at an increased risk of harm due to her inability to detect environmental hazards such as fire, leaking natural gas, and spoiled food. *Id.*

Also in June 2015, plaintiff saw Dr. Allen Cohen, an optometrist with the SUNY College of Optometry that focuses on individuals with vision issues arising from neurological conditions. NYSCEF Doc. No. 305. Dr. Cohen noted that plaintiff had blurry vision, difficulty focusing, short term memory issues including spelling issues, dizziness, loss of balance, migraines, eye pain, frequent fatigue, noise and light sensitivity, difficulty sleeping, anxiety, diplopia, and difficulty processing information that caused a sense of feeling overwhelmed. *Id.* Also in June

[* 4]

2015, Dr. Levine referred plaintiff for vestibular physical therapy, as an addition to other therapies plaintiff was receiving. *Id.*

In August 2015, plaintiff reported to Dr. Bhatt that she believed that she was making improvements relating to her TBI condition with the assistance of vestibular physical therapy, vision occupational therapy, and cognitive remediation. NYSCEF Doc. No. 300. Plaintiff discussed with Dr. Bhatt the possibility of returning to work despite continued issues relating to her injuries. *Id.* Indeed, plaintiff returned to work in September 2015. Prior to the accident, plaintiff was capable of handling long hours without issue; however, when she attempted to return to work, her symptoms made her job difficult because she suffered from headaches, photophobia, feeling faint, and difficulty concentrating. *Id.* As discussed below, after multiple job transitions within JPMorgan Chase, she was eventually terminated for performance reasons. Plaintiff subsequently found and lost new jobs and is presently limited to operating, with assistance, a part-time gelato cart.

In October 2015, plaintiff had a speech and language evaluation by Edna Schneider, SLP at NYU Langone relating to cognitive communication deficits. NYSCEF Doc. No. 303. The medical records indicate that plaintiff "exhibits symptoms of cognitive communication deficits with reductions in speech/language abilities secondary to diagnosis of head injury sustained on 2/2/15." *Id.* Plaintiff noted that she was "having problems retrieving words." Plaintiff's diagnosis was: "Cognitive communication deficits with reductions in speech/language abilities." *Id.* The examination concluded that plaintiff's "[c]ommunication deficits are characterized by: word finding problems, weak phonation with fatigued vocal quality (glottal fry), decreased ability to interpret figurative language, concrete thinking, tangential responses, inattention, decreased comprehension of higher level written material and abilities for generation of graphic

[* 5]

word recall and organization." *Id.* Additionally, "[d]eficits in attention/concentration, impulsivity and difficulty extracting the important from the unimportant further compromise her functional communication." *Id.*

In December 2015, plaintiff began treating with Dr. Kimberly Sackheim, with NYU Langone's Rusk Institute for Rehabilitation Medicine, for pain management. *Id.* The notes indicated that plaintiff had a "significant past medical history for anemia, traumatic brain injury which occurred February 2nd 2015 when a commercial glass door fell on her . . . , benign paroxysmal positional vertigo." *Id.* Plaintiff had continued to suffer from headaches and neck pain, with shoulder pain radiating from the trapezius muscle. *Id.* Plaintiff reported that her headaches last for the entire day, and she has them every day with half of them "exacerbated and very severe" to the point of inhibiting her "quality of life and function." *Id.* Her diagnosis was listed as anemia and traumatic brain injury. *Id.*

Plaintiff continued to receive various types of medical treatments, such as physical therapy from different service providers from June 2016 through November 2016. NYSCEF Doc. No. 306. During this time, in October 2016, plaintiff was treated by Dr. Steven Flanagan, a rehabilitation and brain injury doctor. NYSCEF Doc. No. 303. At this point, plaintiff was continuing to suffer from headaches, neck pain, hyperacusis, fatigue, and light sensitivity, and was in a new position that did not provide her with the ability to take rest breaks with the same frequency as her prior employments. *Id.* Treatment records noted plaintiff's anosmia, neck pain, dizziness, hypersomnia, visual disturbance, nervousness and anxiety. *Id.* To obtain medical treatment to address her continuing disabilities, plaintiff was seeking a referral to a neck specialist located in Missouri. *Id.* Dr. Flanagan recommended that plaintiff continue with

cognitive and physical therapies. He also provided contact information for psychologists with TBI experience. *Id.*

In April 2017, plaintiff saw Dr. Flanagan for a follow-up appointment. He noted that since he last saw plaintiff that she "reported no real change in her symptoms, despite getting a combination of PT, psychology, speech therapy, PTSD treatment, psychiatric care and vision therapy." *Id.* Although plaintiff's symptoms persisted, Dr. Flanagan noted that they occurred with slightly less frequency. *Id.* Additionally, plaintiff reported that she was able to work for longer periods. *Id.* Further, plaintiff had received chiropractic manipulation that improved the quality of her sleep and anxiety levels. *Id.* That stated, plaintiff reported that her employers were nonetheless dissatisfied with the pace of her work. *Id.* Additionally, plaintiff's employer noted her irritability. *Id.* Dr. Flanagan noted that plaintiff was seen again for her loss of smell, but that she did not receive any new recommended treatments designed to address this continuing issue. *Id.*

In May 2017, plaintiff was seen by Dr. Arielle Kurzweil, a neurologist with NYU School of Medicine. NYSCEF Doc. No. 307. The medical records indicate that plaintiff had suffered from a traumatic brain injury with subsequent neurologic symptoms. *Id.* As noted in other medical records, plaintiff reported that her loss of smell and taste had not returned. *Id.* Additionally, plaintiff had difficulty finding words in English, as well as speaking other languages that she knew prior to the accident. *Id.* At this juncture, plaintiff had not yet undergone the MRI of her brain with diffusion tensor imaging ("DTI scan") - as discussed below. After the DTI scan testing was performed, Dr. Kurzweil recorded for an October 2022 visit: "MRI brain and DTI 2017 – evidence of DAI," a diffuse axonal injury, which is typically caused by shearing forces during acceleration, deceleration, or rotation of the brain.

On November 6, 2017, plaintiff underwent a diffusion tensor imaging ("DTI") scan performed under the direction of Dr. Michael Lipton. In his operative report, Lipton interprets the DTI scan, in relevant part, as finding:

> Quantitative analysis of fractional anisotropy (FA) images from DTI demonstrates abnormally low FA in the splenium of the corpus callosum at multiple locations and within the deep left cerebellar white matter. Low FA indicates abnormality of white matter misstructure. The findings, particularly abnormality within the splenium, are consistent with traumatic axonal injury.

NYSCEF Doc. No. 308. While defendant took the position during the trial that plaintiff did not suffer from a TBI, the jury was certainly permitted to accept Dr. Lipton's testimony, as supported by the DTI Scan results, to conclude that plaintiff suffered from a devastating TBI.

In December 2017, Dr. Flanagan noted that plaintiff was suffering from anosmia and a TBI with persistent complaints of impaired cognition. NYSCEF Doc. No. 303. At this point, plaintiff had been moved to an administrative position at work, which was deemed more suited for her then-current abilities. *Id.* Dr. Flanagan noted plaintiff's continued visual disturbance and recommended that she continue to get therapy at SUNY Optometry. *Id.* He also recommended that plaintiff continue with cognitive, vision and supportive therapies. *Id.* Additionally, Dr. Flanagan recommended that plaintiff obtain trigger point injections given her continued neck pain. *Id.*

Plaintiff continued to receive a range of treatments from various providers, and in June 2019, plaintiff was seen by Dr. Anne Felicia Ambrose of Montefiore Medical Center, who was retained by plaintiff to provide an expert opinion at trial. NYSCEF Doc. No. 274. In addition to interviewing plaintiff, Dr. Ambrose conducted testing on plaintiff and reviewed a copious number of medical records. *Id.* Consistent with her eventual testimony at trial, Dr. Ambrose issued a life care plan dated November 13, 2020, which concluded:

Ms. Megan Brown is a 32 year-old woman with no evidence of any cognitive, behavioral or musculoskeletal conditions prior to her brain injury. Thus, within a reasonable degree of medical certainty, I conclude that her current complaints of chronic headaches, neck pain, vestibular and visual complaints, poor memory, impaired executive functioning, emotional lability, poor balance and gait are temporally related to the injury sustained on February 2nd, 2015.

Given the duration since the accident and the extensive medical treatments that Ms. Brown has undergone, it appears that she has reached her maximum medical improvement. Further treatments are only for maintenance of her current functional status.

*Id.*

Kristin Kucsma, of Sobel Tinari Economics Group, evaluated the services that were recommended for plaintiff into the future, and provided an opinion on plaintiff's economic losses. NYSCEF Doc. No. 277.

In July and September 2019, plaintiff was seen by Dr. Robert Charlson, a psychiatrist with NYU Langone. NYSCEF Doc. No. 309. He noted that plaintiff had a TBI and was suffering from anxiety that had improved with medication. *Id.* However, her condition had recently worsened over several months because her employer had relocated to Hudson Yards, which was undergoing construction activities. *Id.* Plaintiff was severely distressed by being around glass objects and construction sites, and attempted to avoid situations that would trigger memories of the accident that caused her to suffer from a TBI. *Id.* Plaintiff reported waking up several times a week sweating, suffering from acute fear, and feeling a sense of impending doom. These episodes also resulted in a shortness of breath, tingling, and loss of control. The TBI continued to result in longstanding problems with her executive dysfunction, memory, sensory processing, and language skills. *Id.* Plaintiff reported that she cannot take the subway or bus due to vertigo issues. Additionally, plaintiff continued to have trouble processing information around her. This has severely restricted her work environment. Finally, plaintiff

[* 9]

followed up with Dr. Charlson into 2024, with progress notes documenting increases in the number and dosage of prescribed psychiatric medicines. *Id.*

In addition to being seen by experts hired on her own behalf, plaintiff underwent independent medical examinations by experts retained by defendant. One such expert was Dr. David Erlanger, a neuropsychologist. Dr. Erlanger also performed a series of tests, and noted background information provided to him by plaintiff in his neuropsychological report, as well.[4] This included that: 1) plaintiff previously spoke Spanish, Portuguese, Italian, and French, but is now unable to communicate in these foreign languages; 2) plaintiff continued to have problems with dizziness and verbal articulation, despite receiving speech therapy; 3) that while cognitive mediation therapy has reportedly been helpful, plaintiff still has problems with basic decision making, including that plaintiff's mother picks out the clothing she is going to wear. Additionally, Dr. Erlanger noted that plaintiff reported being required to take afternoon naps because of cognitive and physical fatigue, and that medication that assists with focus will often leave plaintiff feeling overwhelmed by stimuli. Dr. Erlanger also noted plaintiff reported having difficulty identifying personal and professional mistakes and received extensive eye therapy due to blurred vision and eye pain.

In addition to the other injuries mentioned above, at trial, plaintiff testified about the impact the injuries have caused her everyday life. For instance, plaintiff has difficulty recalling time, weather, or things that happened a few days or weeks ago. When plaintiff saw a doctor

---

[4] Dr. Erlanger reached rather extreme conclusions and asserted that there was no valid evidence of *any* cognitive deficit or injury attributable to the accident and accused plaintiff of being a malingerer. As with other experts called at trial, the jury was free to reject Erlanger's testimony. *McMillian* at 1344. Such a conclusion by the jury would be supported by the multiple validity treatments administered to plaintiff by treating physicians that determined that she was not malingering. Moreover, defendant's attempt to highlight findings in Dr. Wasserstein's (plaintiff's neuropsychologist) examinations that defendant views as inconsistent with the verdict does not require the Court to set aside the verdict; as the fact-finders, the jury was free to consider certain testimony and reject other components of it. *See, id.*; *see also* PJI 1:90.

four days after the incident, she believed that her accident had happened weeks prior. Plaintiff also testified that she loses and forgets things, and that she has had to develop coping strategies, such as leaving her door open, so she does not get locked out. Even if plaintiff sees the knobs of her kitchen stove as straight (off), her cognitive therapist explained that she cannot trust her brain because the brain sees what it expects to see. She struggles with basic conversations, often knowing a word but unable to grasp it, and she has lost her high fluency in foreign languages she once spoke perfectly. During her testimony, plaintiff frequently lost her train of thought, became confused, or was distracted in the presence of the jury. Plaintiff finds her decreased ability to function and the need for strategies frustrating, contrasting sharply with her previously reliable and automatic performance that others could count upon. Plaintiff testified that her loss of smell has diminished her enjoyment of food, making all flavors indistinguishable. Additionally, plaintiff suffers from post-traumatic stress, which keeps her confined to her apartment and drives her to wear a construction helmet and rely on a service dog for support. Her injuries have also impacted her romantic life, leading to a breakup and difficulties dating due to her avoidance of noisy places and abstinence from alcohol. Her ongoing head pain, which contributes to constant neck pain and fatigue, exacerbates her mental suffering and loss of enjoyment in life. Perhaps most alarmingly, plaintiff's expert's testimony indicated that her life will likely end in the throes of Alzheimer's dementia – brought on by an injury she suffered in her 20's in this incident – after a long illness.

## Discussion

Following a trial lasting over two weeks, the jury returned a verdict for plaintiff totaling $35,179,208, which is broken down as follows: (1) $1,750,000 for past pain and suffering; (2) $20,000,000 for future pain and suffering over a period of 45.9 years; and (3) $13,429,208 for

future medical, therapies, medication, and home health care (NYSCEF Doc. Nos. 256, 260). Defendant now moves to set aside that verdict.

At the outset, the Court observes that the New York State Constitution provides that the right to a trial by jury "shall remain inviolate forever." NY Const, art 1, § 2. Given the foregoing, laws adopted by the Legislature providing for judicial review of jury verdicts are required to respect this fundamental constitutional principle. *Yanes v. The City of New York*, 2020 N.Y. Slip Op. 32607(U), *24-25 (Sup. Ct., New York County 2020), *aff'd as modified*, 199 A.D.3d 551 (1st Dep't 2021). In this regard, the governing criterion in reviewing a jury verdict is not whether all concerned *would* assess liability and damages in precisely the same manner as the jury, but whether any reasonable jury *could* have reached the same conclusions based on the record before them. To do so, a defendant must show that "there is simply no valid line of reasoning and permissible inferences [that] could possibly lead rational people to the conclusion reached by the jury on the basis of the evidence presented at trial." *Sow v. Arias*, 21 A.D.3d 317, 317 (1st Dep't 2005), *quoting, Cohen v. Hallmark Cards*, 45 N.Y.2d 493, 499 (1978). That standard sets a high bar.[5]

On the issue of liability, defendant asserts that it did not violate a duty to maintain its property in a reasonably safe condition. *See, e.g., Basso v. Miller*, 40 N.Y.2d 233 (1976). It

---

[5] Recently, a trial-level New York court ruled that the Seventh Amendment to the United States Constitution applies to states, suggesting an even higher standard. *Ball v New York State Dep't of Health*, 2025 N.Y. Slip Op. 25090 (Sup. Ct., Schoharie County Apr. 14, 2025). The Court is respectfully not persuaded by *Ball*, as the United States Supreme Court has not found any constitutional issue in applying CPLR 5501(c) to state law claims adjudicated in federal court despite this statute permitting greater judicial review than permitted by the Seventh Amendment. *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415 (1995) (applying CPLR 5501(c) to a jury verdict in federal court based upon state law claims despite that statute being incompatible with the Seventh Amendment's Reexamination Clause). As the Supreme Court found that the application of CPLR 5501(c) to judicial review of federal verdicts on state law claims does not offend the Federal Constitution, the Court will not do so now. As such, the Court will apply New York's well-known and traveled constitutional and statutory principles in reviewing the instant jury award.

asserts that there was no evidence that defendant created the alleged defective condition, or had actual or constructive notice. *Gordon v American Museum of Natural History*, 67 N.Y.2d 836 (1986). In this regard, defendant notes that it is "common knowledge that glass can break, which is equivalent to a general awareness that a dangerous condition may be present and is legally insufficient to constitute constructive notice of the particular condition that caused plaintiff's injury"; however, that oversimplifies the issue here. *Barber v. Barber*, 255 A.D.2d 934, 935 (4th Dep't 1998) (quotation and citation omitted). In direct contrast to *Barber*, as relied upon by defendant, – where "the door had been used in the same fashion for almost 20 years without incident" – the record before this jury showed evidence of multiple incidents involving the doors at defendant's building within five years. *Compare, Barber, supra., with* Mem. of Law in Opp., at 5.

Moreover, unlike *Barber*, the door at issue here is part of an open public premises, imposing a heightened standard of care beyond that imposed upon a private homeowner in *Barber. See, e.g., Aldalali Sungold Assocs. Lts. Partnership*, 195 A.D.3d 500, 501 (1st Dep't 2021). In any event, "[a] defendant property owner has constructive notice of a defective or dangerous condition where it is visible and apparent and existed for a sufficient period to allow the defendant to discover and take remedial action." *Gomez v. Samaritan Daytop Vill., Inc.*, 216 A.D.3d 456, 457 (1st Dep't 2023). Defendant's reliance at oral argument on *Daniely v. County of Westchester*, 297 A.D.2d 654 (2d Dep't 2002), is also misplaced, as the Second Department distinguished evidence of "two prior instances in which the [defect at issue occurred], they occurred at least 100 feet from the accident site," in setting aside a verdict. Here, the record before the Court after trial does not indicate the kind of spatial or substantive similarities to *Daniely* necessary to bind the Court's ruling.

Messrs. Alpert and Santos' testimony provided a basis for a reasonable jury to find liability, as reflected in the record. Particularly, after a second shattering incident, defendant's representatives (Mr. Santos especially) acknowledged that this was a basis for concern, follow-up, and investigation, but that defendant did not engage in any of that. As noted above, the building staff even saved contact information for a glass door vendor. While there is some testimony in the record that staff were directed to check for glass defects as part of their regular maintenance duties, that testimony was contradicted by other staff members' testimony.[6] In the face of that contradictory testimony from defendant's own representatives, a jury could reasonably conclude both that there was a basis for concern and diligence in checking the suspect door, but also that defendant had failed in its obligations to the public such that it weighed heavily in showing the existence of actual or constructive notice.

Turning to defendant's questioning of the competing expert testimony in this case, the Court notes the threshold issue that "a classic battle of the experts…is properly left to a jury for resolution." *Nowell B. v. Hamilton Med, Inc.*, 177 A.D.3d 1256, 1258 (4th Dep't 2019). What defendant discounts as speculation by plaintiff's witness Prof. Goel is opinion testimony by an expert and subject to consideration by the jury; whether the jury accepts or rejects that opinion in whole or part is inherent to the jury's role as noted in *Nowell B*. Plaintiff correctly notes that the parties' competing experts' professional qualification (namely that plaintiff retained a professor/scientist as an expert, while defendant retained a practical expert with decades of experience in glass-related business) is also fair game for the jury's consideration. *See, e.g., Estate of Santiago v. Santiago*, 75 Misc. 3d 1201(A), *3-4 (Civ. Ct., Bronx Co. 2022) (finding

---

[6] Contrary to defendant's contentions that the conflicts in Messrs. Alpert and Santos' testimony may have been developed through aggressive cross-examination, it is of little import. Cross-examination is inherently adversarial, and its reason for being so is to uncover potentially damaging information through routine follow-up questions. That is not a basis to discount the information adduced.

**152267/2015 BROWN, MEGHAN vs. 271 MADISON CO.**
**Motion No. 007**

**Page 14 of 22**

that expert's "methodology or conclusions go to the weight, not the admissibility, of his testimony, and are matters for the jury's consideration"). While defendant's expert, Mr. Negrin, was qualified to offer his opinion, the jury was empowered to balance Mr. Negrin's views against Prof. Goel's, and defendant has not shown that it was inherently unreasonable for the jury to favor the opinion of a professor and scientist over Mr. Negrin's practical, but more lightly credentialed, experience. Again, the question following *Sow* is whether there is any "valid line of reasoning and permissible inferences which could possibly lead rational people to the conclusion reached by the jury," not whether everyone would agree with them. *Sow, supra.* Even if, arguendo, a reasonable jury could have favored Mr. Negrin's testimony over Prof. Goel's testimony, if a reasonable jury could have favored Prof. Goel (which the Court finds), that ends the discussion.

Defendant's apparent argument that the jury could not have taken a negative inference from defendant's destruction of relevant video is entirely misplaced. It is true that the Court did not give a negative inference instruction, but that does not bar the jury from taking defendant's deliberate deletion of highly relevant evidence into account when reaching its verdict. *State v. 158th Street & Riverside Drive Housing Co., Inc.*, 100 A.D.3d 1293, 1295-96 (3d Dep't 2012) (noting that counsel can discuss missing evidence, and a jury can essentially take a negative inference about a failure to preserve or produce that evidence even in the absence of a negative inference charge). Moreover, at this stage, as noted at oral argument, the Court "can take into account, in terms of the weight to be provided, that this was an insurance investigator who knows that notice is an issue in personal injury lawsuits and decided not to film that." (NYSCEF Doc. No. 319, at 5).

Regarding the scope of plaintiff's injuries, defendant's argument that the jury's conclusions are against the weight of the evidence is not well-founded. Once again, with *Sow* and *Nowell B.* in mind, the question is whether a reasonable jury *could* reach the conclusion at issue. As another judge of the Court noted in a different action:

> The Court evaluates jury verdicts with extreme deference. Unless no reasoning and no permissible inferences could in any way lead rational jurors to reach their conclusion based on the evidence that the parties presented at trial, the jury verdict must be upheld. When experts disagree on whether a plaintiff's injury is an accepted complication of a medical procedure or post-surgical treatment, is a jury issue. The jury also may make credibility findings, including those to resolve conflicts between the parties' experts' testimony. When one party accuses witnesses of lying on the stand, it is up to the jury to determine whether to accept this argument. Moreover, a trial court may not interfere with a jury's fact-finding process simply because it disagrees with its finding or would have reached a contrary conclusion based on different credibility determinations. This would be an impermissible use of the court's discretion and would usurp the jury's function.

*D'Aliasi v. Shavelson*, 2017 NY Slip Op 30053(U), *6-7 (Sup. Ct., New York County 2017) (quotations and citations omitted).

In considering the expert-dependent question of plaintiff's injuries, a reasonable jury could choose to favor the opinions of plaintiff's well-credentialed treating, and seldom-testifying, physicians (one of whom was described as "a luminary" in her field by one of defendant's own experts, and as renowned by another) over witnesses who did not treat plaintiff, who generated a supermajority of their income from testifying in court rather than treating patients, and/or who only found out they would be testifying the night before taking the stand. Echoing *D'Aliasi*, defendant's expert, Dr. Erlanger, agreed on cross-examination that he was calling plaintiff a liar. "[Defendant] challenged [plaintiff's] witnesses' credibility and conclusions throughout the trial, on the same grounds they argue here, and the jury had the opportunity to accept or reject these challenges," and "[a]lthough the jury could have found that

[plaintiff's] witnesses were not credible...its failure to do so does not mean that the jury acted irrationally." *D'Aliasi*, at \*7.

Turning to defendant's challenge to the amount awarded, that branch of defendant's motion is also denied. Plaintiff was a successful working professional prior to the accident at issue, and now relies on her mother and an aide for assistance with tasks as simple as assembling a grocery list or doing laundry. That plaintiff operates a part-time gelato business is commendable, and the jury could have deemed it to be a mitigating factor against more damages, but does not itself change the narrative in the manner defendant proposes.[7] As a result of her traumatic brain injury, plaintiff went from speaking foreign languages fluently to being unable to speak these languages and struggling to find words in English. She has vestibular problems. She cannot smell most things, which also plays a role in reducing her ability to taste foods, such as those she would otherwise enjoy.

Plaintiff also faces the prospect of facing these limitations and needing ever increasing levels of personal assistance for nearly half a century based upon life expectancy tables and the jury's finding that plaintiff would live an additional 45.9 years. Plaintiff's expert testified, and the jury apparently credited, that plaintiff is at high risk of developing dementia by age 60, resulting in a future need for full-time care. Plaintiff's supporting evidence also included

---

[7] Defendant's counsel went further at oral argument, stating, that

> I would submit she finds great enjoyment in her gelato stand. I don't know many folks who are successful at what they do who don't enjoy it. I would venture a guess the evidence to the jury demonstrated she enjoyed her life a lot and maybe is even happy with the way things are maybe not about the incident, but has found a very good life, a very happy life, not a life where she misses being a banker.

(NYSCEF Doc. No. 319, at 16). Assuming a jury could have reached such a conclusion, it was not irrational for this jury to conclude that plaintiff being limited to part-time work at a gelato stand is a devastating impact on her quality of life.

testimony by a forensic economist. While defendant offered experts, the jury was permitted to discount or reject their opinions. PJI 1:90 (noting that a jury can discount or reject an expert opinion if it finds the facts different than from those upon which the opinion is based or, after considering all the evidence, disagrees with the opinion). In the end, this significant period of dementia, that is untypical for such an extended period, justified the substantial monetary awards memorialized in the jury verdict.

None of the cases relied upon by defendant provides a true comparable to the plaintiff in this action. For instance, defendants rely heavily upon *Andino v. Mills*, 135 A.D.3d 407 (1st Dep't 2016) and *Godfrey v. G.E. Capital Auto Lease, Inc.*, 89 A.D.3d 471 (1st Dep't 2011). But the First Department in *Hedges v. Planned Security Service*, 190 A.D.3d 485, 488 (1st Dep't 2021) rejected the use of these two decisions in a situation where a plaintiff suffers debilitating brain injuries, such as the instant action. *Hedges*, however, does not support a reduction in the jury award. Mrs. Hedges was a married middle-aged woman with children. Ms. Brown is twenty years younger than Mrs. Hedges. Further, Ms. Brown is no longer a realistic candidate for marriage and parenting children. Notably, Ms. Brown's fiancé abandoned her because her injuries made her more of a burden than he could bear. Rather than caring for children, the jury verdict reflects that Ms. Brown will be the one requiring attention as she faces a lingering decline into dementia.

A potentially more suitable comparable case on the issue of future pain and suffering is *Perez v. Live Nation Worldwide, Inc.*, 193 A.D.3d 517 (1st Dep't 2021), which resulted in an appellate reduction of a jury verdict to $15 million for this quantum of damages. Therein, Mr. Perez suffered greater initial injuries than Ms. Brown, which is reflected in a substantially greater past pain and suffering award. *Perez v. Live Nation Worldwide, Inc.*, (Sup. Ct., New York Co.

2020). As relevant to an award for future pain and suffering, it is notable that many of Mr. Perez's permanent injuries are similar to those suffered by Ms. Brown:

> [T]he plaintiff at trial demonstrated that his traumatic brain injury resulted in numerous, extensive, and ongoing symptoms, including continual head pain, post-traumatic epilepsy, left hemiparesis, light and noise sensitivity, emotional dysregulation, depression, anxiety, fatigue, post-traumatic stress disorder, clinically severe neuropsychiatric disorder, aphasia, and profound cognitive deficits, such as deficits in motor speed, attention, information-processing speed, verbal fluency, visual perception, verbal linguistic function, memory, concentration, attention, and executive functions.

*Id.* at *6. Additionally, Mr. Perez was no longer able to maintain any romantic relationships after the accident. *Compare id.* at *7 with NYSEF Doc. No. 265 at 769-772. Interestingly, defendant's experts in *Perez*, as with several of defendant's experts in this action, accused Mr. Perez of being a malingerer. *Id.* at *9. Unlike Mr. Perez, Ms. Brown suffered from anosmia due to the accident causing her a complete loss of smell and near complete loss of taste. Further, Ms. Brown is expected to live approximately three years longer than Mr. Perez, according to the jury verdicts reached in their respective actions.

While the First Department saw fit to reduce the award of Mr. Perez's damages to $15 million from what was originally a $75.25 million verdict, the jury verdict in this litigation was very measured. As the verdict in this action is not an example of a "runaway jury," it is appropriate to keep in mind the First Department's pronouncement that a "[m]odification of damages, which is a speculative endeavor, cannot be based upon case precedent alone, because comparison of injuries of different cases is virtually impossible." *Poo Yee So v. Wing Tat Realty, Inc.*, 259 A.D.2d 373, 374 (1st Dep't 1999). This is particularly pertinent in traumatic brain injury cases because the impact being measured is not solely the severity of the injury, but also on a variety of personal, social, and contextual factors. In the circumstances of this application, the Court finds that a jury award to Ms. Brown for future pain and suffering, including the loss of

enjoyment of life, that is $5 million beyond the amount deemed, three years earlier, to be reasonable compensation for Mr. Perez's future pain and suffering does not warrant modification.

The foregoing is not to suggest in any way that defendant's case was factually frivolous or poorly argued. Far from it, as counsel very ably argued defendant's case and their post-trial motion papers reflect what would be a very effective closing argument to their case. But with a jury verdict having been delivered, "[e]very favorable inference must be accorded to the party in whose favor the verdict was rendered." *Piro v. Demeglio*, 150 A.D.3d 907, 908 (2d Dep't 2017). Thus, even assuming (as the Court does without deciding) that one reasonable jury could have ruled in favor of defendant, the facts are not such that the Court could conclude that any reasonable jury could not have reached the conclusions as those reached by this jury. *D'Aliasi*, *supra*. Similarly, a jury also could reasonably have, based on the record before it, made a significant award to plaintiff for future pain, suffering, and care, and did so.[8]

Finally, as to defendant's allegations of improper comments by counsel during the trial, this was "a complex and hotly litigated matter, which the docket sheet alone confirms." *In re First Constitution Shareholders Litig.*, 145 F.R.D. 291, 294 (D. Conn. 1991). Courts have noted that "we expect advocates in our adversary system of justice to use all of their forensic skills to persuade of the wisdom or justice of their respective position, drawing upon the work of experienced professionals," such as the well-known and well-regarded counsel that have appeared for both sides in this action. *Isaly v. Burke*, NYLJ, Oct. 31, 2024 at p.17, col.1, 2024

---

[8] The parties initially made much of where plaintiff would be located at the time future medical treatment might be needed; however, the jury award was not contrary to the weight of the evidence, and it was supported by the testimony and documents admitted into evidence at trial. Certainly, defendant did not place competing evidence before the jury on this subject and, as such, must accept the consequences of this litigation strategy. *Katan Group, LLC v CPC Resources, Inc.*, 127 A.D.3d 550, 551 (1st Dep't 2015).

**152267/2015 BROWN, MEGHAN vs. 271 MADISON CO.**
**Motion No. 007**

**Page 20 of 22**

NYLJ LEXIS 3483, \*23 (Sup. Ct., New York Co.) (quotation and citation omitted), *adopted in full, sub nom, Isaly v. Garde*, 2024 NY Slip Op 34311(U) (Sup. Ct., New York Co. 2024). Others have noted that "[i]n spite of considerable rhetoric to the contrary, trials, particularly jury trials, are imperfect," and that "[w]ithout radical change in our approach to the trial process we have no choice but to accept imperfections, inconsistencies," and occasionally worse as inherent to the process. *Hatch v. State Farm Fire & Cas. Co.*, 930 P.2d 382, 398 (Wyo. 1997) (O'Brien, J., concurring). *See also, State v. Knight*, 432 P.3d 694, \*13 (Kan. Ct. App. 2019) (Atcheson, J., dissenting) (noting that "[a]s with all human endeavors, jury trials are imperfect"); and *United States v. Olsen*, 622 F. Supp. 3d 856, 884 (C.D. Cal. 2022) (noting that "[a]dversarial proceedings will necessarily involve instances, hopefully rare instances, in which one party crosses boundaries").

Further, while plaintiff is incorrect in suggesting that defendant did not sufficiently preserve the issue by seeking a curative instruction as an alternative to its mistrial application, a new trial is not necessary. When counsel's zeal with which the adversary system depends on scuffed against the guardrails – as it briefly did when, for example, counsel referred to a defense witness as a fraud in front of the jury or, much less problematically, sought to cross-examine a plaintiff's witness with a newspaper article – the Court addressed the issue. Regarding the statement made by plaintiff's counsel to an expert witness that accused his client of being a malingerer, the Court provided a real-time curative instruction. Additionally, the Court polled the jury that they could and would comply with the Court's directive to disregard the comment and to ensure that they would be comfortable continuing in an impartial manner. Where curative instructions were necessary, they were given, and there is no indication in the record to overcome the presumption that the jury understood and followed them. *See, Topczij v. Clark*, 28

[\* 21]

A.D.3d 1130, 1140 (4th Dep't 2006); *Martelly v. New York City Health & Hosps. Corp.*, 276 A.D.2d 373, 373 (1st Dep't 2000). The standard remains whether "a case is measured, not by the merit of the cause, the quality of the evidence, or the logic of the arguments, but by the level of invective," such that the trial became "an ordeal which is neither dignified nor appropriate, in which "the result reflects the performance." *Hatch, supra*; *see also Zapata v. Dagostino*, 265 A.D.2d 324, 326 (2d Dep't 1999) (noting that a new trial was not required by an attorney's remark unless it deprived the adverse party of a fair trial). That did not happen here, and the jury's verdict should not be disturbed on that basis.

All other arguments advanced by defendant not discussed above were also considered and found to be without merit.[9]

Accordingly, the motion to set aside the verdict is denied. This constitutes the Decision and Order of the Court.

| 5/12/2025 | | | | | |
|-----------|---|---|---|---|---|
| **DATE** | | | | James d'Auguste, J.S.C.[10] | |
| CHECK ONE: | X | CASE DISPOSED | | NON-FINAL DISPOSITION | |
| | | GRANTED | X DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

---

[9] The Court will conduct a collateral source hearing, as requested by defendant.

[10] The Court notes the invaluable assistance of court attorney Brian Krist, Esq. over the course of the trial and subsequent motion practice.

**152267/2015 BROWN, MEGHAN vs. 271 MADISON CO.**
**Motion No. 007**

[* 22]